**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William ROBINSON, Defendant–**
**Appellant.**

**No. 02–2756.**

United States Court of Appeals,
Seventh Circuit.

Argued Submitted Jan. 29, 2003.

Decided March 27, 2003.

Before COFFEY, EASTERBROOK, and KANNE, Circuit Judges.

ORDER

After a jury convicted William Robinson of two counts of distributing crack cocaine in violation of 21 U.S.C. § 841(a)(1), the district court sentenced him to concurrent terms of 100 months' imprisonment. Robinson challenges his conviction on two grounds: (1) that the district court violated the dictates of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), by failing to instruct the jury to find beyond a reasonable doubt that Robinson distributed the quantity of crack cocaine alleged in the indictments; and (2) that the evidence was insufficient to prove that he was the one who distributed the crack cocaine. We affirm.

## Background

Robinson's conviction arose from two crack cocaine transactions with an informant under the direction of the now defunct Chicago Housing Authority Police Department ("CHAPD") in August 1997. That year the CHAPD, in conjunction with federal law enforcement agencies, investigated a crack enterprise operating at the LeClaire Courts public housing complex. CHAPD sergeant John Hersey supervised the investigation. To assist with the investigation, the CHAPD employed a twice-convicted crack dealer and former LeClaire resident named Anthony Clemmons. In August 1997 the CHAPD targeted Robinson, and asked Clemmons, who had known Robinson for several years as "Sugar," to buy crack from him. Clemmons, wearing a body wire and accompanied by an undercover CHAPD officer, Charles Mitchell, purchased an ounce (approximately 28 grams) of crack from Robinson on August 11 and 13. Clemmons was paid $600 for each transaction along with relocation and moving expenses.

In April 1998 a grand jury returned indictments charging Robinson with two counts of crack cocaine distribution for the August 11 and 13 transactions. The indictments specifically charged Robinson with knowingly and intentionally distributing "approximately 28 grams" and "approximately 27.7 grams" of crack cocaine respectively. The government filed the indictments a year later in November 1999, and arrested Robinson shortly thereafter. Robinson pleaded not guilty and requested a jury trial.

### A. The Trial

At trial, Hersey, Mitchell, and Clemmons recounted the two transactions for the jury in detail. Clemmons testified that Robinson was the man who sold him the crack cocaine on each occasion, and Officers Hersey and Mitchell corroborated that identification. Hersey and Mitchell testified that upon returning to the CHAPD headquarters after the August 11 transaction, Mitchell identified Robinson as the man who dealt with Clemmons from an array of five photographs. Both officers made in-court identifications of Robinson as the individual they observed with Clemmons during the two buys. The government's forensic scientists analyzed and confirmed that the off-white, rocky substances Clemmons purchased weighed 28 grams and 27.7 grams respectively, and contained cocaine base. In addition, the scientists testified that, given its consistency, the cocaine base appeared to be in the form of crack.

Defense counsel argued that Robinson did not deliver the crack to Clemmons, suggesting instead that the culprit was Robinson's older brother Deshon. In support of this theory, counsel pointed to inconsistencies between Officer Mitchell's descriptions of the perpetrator and Robinson's actual appearance. Officer Mitchell's written reports immediately following each transaction described Robinson as 5 feet 8 inches tall and 175 pounds, whereas Robinson is 6 feet 2 inches and then weighed 215 pounds. Robinson also presented evidence that his brother Deshon, who lived at the same LeClaire Courts address and sometimes went by the name "Sugar," fit Officer Mitchell's description. Mitchell explained that he simply copied the descriptive information contained in his written reports from a police index file on Robinson; the man he observed was a bit taller at 5 feet ten inches and a bit heavier at 180 pounds. But Robinson argued that that description did not match his actual appearance either and the photo line-up from which Mitchell allegedly identified Robinson was not presented at trial be-

cause it had been inadvertently destroyed when the CHAPD disbanded in 1998.

In contradiction of Robinson's misidentification theory, the government presented the testimony of another Chicago police officer, Brad Redrick. Officer Redrick patrolled the LeClaire Courts community daily during the previous ten-year period and talked to Robinson, whom he identified in the courtroom, in person on more than one hundred occasions. The government asked Redrick to listen to the tape recordings of the Clemmons transactions to determine whether he recognized Robinson's voice. Robinson testified that he indeed heard Robinson's voice on the tapes dealing with Clemmons. Redrick testified that he also was familiar with Deshon Robinson, having talked to him probably twenty times. According to Redrick, Deshon's voice was "squeakier" than Robinson's, and he did not hear it on any of the recordings. Redrick said that he never knew Deshon to go by the nickname "Sugar."

### B. Jury Instructions

Without objection from defense counsel, the court accepted the instructions proposed by the government regarding the name, makeup, consistency, and quantity of the drugs sold. The court first instructed the jury that to find Robinson guilty the government must have proven beyond a reasonable doubt that he knowingly and intentionally distributed cocaine base. The court advised that the government need not prove that the offense actually involved the amount of cocaine alleged in the indictment; rather, the government must prove merely that a "measurable amount" of cocaine base was involved.

Based on *Apprendi*, the district court went on to instruct the jury that if it found Robinson guilty, then it must further decide whether the government proved be-

yond a reasonable doubt that the form of cocaine base involved in each count was crack cocaine, and that the amount of crack cocaine sold on each occasion was five grams or more. Accordingly, the verdict forms supplied to the jury asked the jury to check one of three boxes. The jury was to check box one if it found beyond a reasonable doubt that "the form and amount of cocaine base that defendant distributed ... was at least five grams of the form of cocaine base commonly known as crack cocaine;" the jury was to check box two if it found that the defendant distributed a "lesser measurable amount" of crack; and the jury was instructed to check box three if it found "some measurable amount" of "some form of cocaine base other than crack" had been distributed by the defendant.

The jury found Robinson guilty of both counts and checked box one on both verdict forms. Robinson moved for acquittal or, in the alternative, for a new trial, arguing that the verdicts were against the manifest weight of the evidence and that the court erred in not dismissing the indictments because of the destruction of evidence. The district court denied the motions.

### C. Sentencing

Robinson was sentenced in this case in June 2002 to two concurrent 100–month prison terms, followed by 5 years' supervised release also to run concurrent with each other. The district court arrived at that sentence by first determining by a preponderance of the evidence that Robinson's two crack cocaine offenses involved a total of 56 grams. Based on that amount, the court assigned a base offense level of 32, which combined with Robinson's criminal history category of I, yielded a sentencing range of 121 to 151 months. The court then granted Robinson a 3–level

downward departure from that range because his commission of these crimes was "aberrant behavior,"[1] which lowered his sentencing range to 87 to 108 months.

## Discussion

On appeal, Robinson argues for the first time that the district court's failure to instruct the jury that it must find beyond a reasonable doubt the precise amount of crack cocaine specified in his indictments violated the rule announced by the Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In fact, when asked by the court whether he had any objections to the government's proposed instructions, he confirmed to the court that he had none. Therefore, we review this challenge to the jury instructions for plain error. *United States v. Jones*, 245 F.3d 645, 648 (7th Cir.2001). "Under the plain error standard, we will not reverse a decision unless the defendant demonstrates that (1) there was error; (2) the error was plain; and (3) the error affected the defendant's substantial rights."[2] *United States v. Trennell*, 290 F.3d 881, 887 (7th Cir.2002). If these three conditions are satisfied, "we may correct the error if in our discretion, we find the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 887; *accord United States v. Cotton*, 535 U.S. 625, 122 S.Ct. 1781, 1786, 152 L.Ed.2d 860 (2002).

In *Apprendi*, the Supreme Court held that "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.... '[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.'" 530 U.S. at 490, 120 S.Ct. 2348 (quoting *Jones v. United States*, 526 U.S. 227, 252–53, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)). Accordingly, this court has mandated that the trier of fact must determine the elements of the offense that appear in 21 U.S.C. § 841(a), and the threshold amount listed in § 841(b) relied upon by the court to establish the maximum statutory penalty; however, this court does not require the trier of fact to determine the precise quantity of drugs in question. *United States v. Smith*, 308 F.3d 726, 740–42 (7th Cir.2002); *United States v. Bjorkman*, 270 F.3d 482, 492 (7th Cir. 2001); *United States v. Brough*, 243 F.3d 1078, 1080 (7th Cir.2001).

Here, the district court more than complied with this mandate by instructing the jury to decide whether the government had proven beyond a reasonable doubt that the amount of crack that Robinson distributed exceeded 5 grams.[3] The jury

---

1. U.S.S.G. § 5K2.20. For purposes of § 5K2.20, "aberrant behavior" means a "single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20, comment. (n.1).

2. Fed.R.Crim.P. 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The *Olano* Court explained this final Rule 52(b) element as follows: "This is the same language employed in Rule 52(a), and in most cases it means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The *Olano* Court goes on to say that under Rule 52(b) it is the defendant "who bears the burden of persuasion with respect to prejudice." *Id.*

3. For crack cocaine offenses, § 841(b) specifies different statutory maximum sentences dependent upon the following threshold amounts: (A) 10 years to life for over 50

found that Robinson indeed distributed 5 grams or more, thus subjecting him to a 40–year maximum penalty. Robinson's sentence of 8 years and 4 months fell well below the maximum authorized by the jury's verdict, as well as the statutory maximum sentence for distributing even a minute amount of crack cocaine. We have stated many times that "when a defendant is sentenced to a term of imprisonment within the statutory maximum for the crime of which he was convicted, '*Apprendi* is beside the point.' " *Jones*, 245 F.3d at 649 (quoting *Talbott v. Indiana*, 226 F.3d 866, 869 (7th Cir.2000)); *see also Brough*, 243 F.3d at 1080 ("[A]ny penalty up to 20 years is lawful even if the jury does not find a particular quantity, because 20 years is the maximum under § 841(b)(1)(C) for unlawfully distributing any detectable quantity of any Schedule I or II controlled substance.").

Nonetheless, Robinson argues that the court's instructions, even though he failed to timely object to them anytime during trial, violated his due process and jury trial rights because, without a finding as to the precise amount of crack, it is impossible to discern whether the jury unanimously agreed that the government met its burden of proof. As Robinson's counsel acknowledged at oral argument, this argument is premised on the untenable view that *Apprendi* requires that drug quantity be treated an element in § 841 cases irrespective of the penalty imposed.

We recently rejected a nearly identical argument, holding that a special verdict form asking the jury to find a threshold amount under § 841(b)(1), rather than the exact amount alleged in the indictment, satisfied the *Apprendi* rule. *See United States v. Smith*, 308 F.3d 726, 740–42 (7th

Cir.2002). In so holding, we reiterated that the law in this circuit is clear: drug quantity is not an element of the offense under § 841. *Id.* at 740–41 ("If drug amount were a true element of § 841, then a failure by a jury to agree on the drug amount would mean that 'there is *no offense at all.*' " (quoting *Bjorkman*, 270 F.3d at 492 (emphasis in original))); *Trennell*, 290 F.3d at 887. As we explained in *Bjorkman*, "*Apprendi* does not rewrite or change the elements of any federal offense," rather, it requires only that the jury find beyond a reasonable doubt facts that raise the maximum lawful punishment. 270 F.3d at 491. Contrary to Robinson's assertion, the Supreme Court's recent decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), does not suggest otherwise. In *Ring*, the Court merely held that, under *Apprendi*, additional facts increasing a statutory maximum punishment from life to death must be submitted to the jury and proven beyond a reasonable doubt. 122 S.Ct. at 2439, 2443. The jury instructions given here did not run afoul of either *Apprendi* or *Ring*.

Robinson next argues that the evidence was insufficient to prove that he was the one who distributed the crack cocaine to Clemmons. In particular, he contends that Clemmons's testimony identifying him was "unreliable" and "uncorroborated." When reviewing a sufficiency of the evidence claim, this court considers whether, viewing the evidence in the light most favorable to the government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Crotteau*, 218 F.3d 826,

grams of crack, 21 U.S.C. § 841(b)(1)(A)(iii); (B) 5 to 40 years for 5 grams or more, 21 U.S.C. § 841(b)(1)(B)(iii); and (C) up to 20 years for less than 5 grams, 21 U.S.C. § 841(b)(1)(C).

834 (7th Cir.2000). Defendants making such a claim face a "very high hurdle." *Crotteau,* 218 F.3d at 834. "Reversal is warranted only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *Id.*

This court does not reweigh the evidence or reassess the credibility of the witnesses. *Id.* Yet, that is precisely what Robinson asks this court to do here. Robinson attacks Clemmons's identification, primarily arguing that he was a paid informant, a convicted drug dealer, and a marijuana addict who admitted to having smoked pot during one of the transactions at issue. This court does not second-guess fact-finders' credibility determinations because they have had the opportunity to observe the verbal and nonverbal behavior of the witnesses including their reactions, responses, expressions, attitudes, tones of voice, eye contact, postures, body movements, and speech patterns. *United States v. Mancillas,* 183 F.3d 682, 701 n. 22 (7th Cir.1999). In contrast, we are merely presented with the cold pages of the record. *Id.; see also Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir.1992) ("A witness's behavior during the trial can very well reveal deception or untruthfulness through evasiveness on the witness stand that is more frequently that not undiscernible in the pages of a deposition."). Thus, this court will overturn a conviction based on a credibility determination when the witness's testimony was "incredible as a matter of law." *United States v. Jackson,* 177 F.3d 628, 630 (7th Cir.1999).

Clemmons unequivocally testified that Robinson sold him the crack on August 11 and 13:

> Q: Do you see the person that you know as Sugar in the court room today?
> A: Yes.

Q: And is that the person from whom you bought narcotics on August 11 and August 13, 1997?

A: Yes.

[Clemmons identified the defendant in the courtroom.]

Q: Are you certain the person you purchased crack from on August 11 and 13 of '97 is William Robinson not Dishon [sic] Robinson?

A: Yes.

True, Clemmons, like many informants in a number of criminal cases, was not a model citizen. We cannot always get nuns, priests, rabbis, ministers, and imams. But the jury heard the evidence of Clemmons's marijuana use, potential motives, and generally unsavory character, and chose to believe him nonetheless. "When a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it, we have no basis to interfere." *Jackson,* 177 F.3d at 631.

In addition, contrary to Robinson's assertion, there was evidence at trial corroborating Clemmons's identification. Mitchell, who spoke face-to-face with Robinson after the second buy, identified Robinson in court as the man he observed with Clemmons during both transactions. Hersey likewise identified Robinson as the individual he observed talking to Clemmons during the controlled buys. And, Redrick identified Robinson's voice on the four tape recordings of the transactions. Robinson, however, contends that Officer Mitchell's description of Robinson was inconsistent with his actual appearance; the photo lineup was destroyed; neither Hersey or Mitchell observed the drugs change hands; and Officer Redrick's voice identification was flimsy. These arguments suffer the same fate as his credibility challenge. In weighing the evidence, the jury had the

opportunity to observe the witnesses' behavior, while this court has only a cold record to review. *Mancillas*, 183 F.3d at 701. Accordingly, "[i]t is the jury's job to choose among competing but reasonable interpretations of witnesses' testimony." *Jackson*, 177 F.3d at 631. After the jury, as its duty requires, considered all identification testimony, it chose to convict.

AFFIRMED

